1  PHILLIP A. TALBERT
   United States Attorney
2  HENRY Z. CARBAJAL III
   JEFFREY A. SPIVAK
3  Assistant United States Attorneys
   2500 Tulare Street, Suite 4401
4  Fresno, CA 93721
   Telephone: (559) 497-4000
5  Facsimile: (559) 497-4099

6
7  Attorneys for Plaintiff
   United States of America

**SEALED**

**FILED**

Aug 04, 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

8          IN THE UNITED STATES DISTRICT COURT
9             EASTERN DISTRICT OF CALIFORNIA
10

11  UNITED STATES OF AMERICA,          CASE NO.  1:22-CR-00214-DAD-BAM

12                    Plaintiff,       18 U.S.C. § 1343 – Wire Fraud (10 Counts); 18
                                       U.S.C. § 1956(a)(1)(B)(i) – Money Laundering (11
13             v.                      Counts); 18 U.S.C. § 1343 – Wire Fraud Affecting a
                                       Financial Institution (5 Counts); 18 U.S.C. § 1344 –
14  TERRANCE JOHN COX,                 Financial Institution Fraud; 52 U.S.C. §§ 30122 and
    aka T.J. Cox,                      30109 – Contributions in the Name of Another; 18
15                                     U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(2), and 28
                      Defendant.       U.S.C. § 2461(c) -Criminal Forfeiture
16

17
18                        I N D I C T M E N T
19  COUNTS ONE THROUGH THREE:  [18 U.S.C. § 1343 - Wire Fraud]
20       The Grand Jury charges:
21                   TERRANCE JOHN COX, aka T.J. Cox,
22  defendant herein, as follows:
23                     I.    **INTRODUCTION**
24       1.    At all times relevant to this indictment:
25       2.    Defendant TERRANCE JOHN COX, aka T.J. Cox, ("COX") was a resident of Fresno,
26  California. From January 2019 to January 2021, COX served as a Member of Congress in the U.S.
27  House of Representatives, representing the 21st Congressional District in California.
28       3.    COX partially owned, managed and was employed by several different for-profit and

INDICTMENT                        1

non-profit companies located in the Eastern District of California. The affiliated companies included the following:

a)     COX was one of three owners, and the managing member, of a Fresno-based for-profit company that assisted other companies in applying for and obtaining funding in the form of loans and federal New Markets Tax Credits for the support of development projects in, typically, disadvantaged areas of central California (hereinafter the "Tax Credit company"). For several years, COX was the sole signatory over the Tax Credit company's operating bank account. The company was formed in approximately 2010. COX held his ownership in the Tax Credit company through a pass-through entity named MJTJ, LLC.

b)     COX partially owned, and was one of the signatories on the bank accounts for a for-profit company that processed raw almonds for wholesale distribution (hereinafter the "Almond Processing company").

c)     COX was a co-director and board member of a non-profit company that operated an outdoor recreation facility and an indoor ice skating/hockey rink in the City of Fresno (hereinafter the "Sports non-profit").

4.     COX's affiliations and business activities overlapped across the aforementioned business entities, with COX using the businesses and his business partners as part of a variety of transactions and schemes further described throughout this Indictment. For example, COX caused the Tax Credit company to make purported loans from time to time to the Almond Processing company. COX, by obtaining funding through a fraudulent loan application package, purchased a home from one of his business partners in the Almond Processing company, which he rented to another business partner in the Almond Processing company. COX submitted the Tax Credit company as a guarantor on a construction loan to the Sports non-profit. COX also solicited and received congressional campaign donations in the name of business associates affiliated with the Almond Processing company and the Sports non-profit.

## II.    FRAUD INVOLVING THE TAX CREDIT COMPANY AND ITS CLIENTS

### A.    Scheme to Defraud

5.     Beginning on a date unknown to the Grand Jury, but not later than in or about December 2013 and continuing to and including at least October 2019, in the State and Eastern District of

California and elsewhere, defendant TERRANCE JOHN COX knowingly devised, intended to devise, participated in, and executed a material scheme and artifice to defraud clients of the Tax Credit company and the Tax Credit company of money and property, and to obtain money and property from clients of the Tax Credit company and the Tax Credit company by means of materially false and fraudulent pretenses, representations, and promises.

### B.  Manner and Means

6.    The scheme to defraud was carried out, in substance, generally in the following manner:

7.    In approximately 2010, COX and two business associates established the Tax Credit company. The Tax Credit company was created to operate as an intermediary for real estate development projects in predominately disadvantaged areas that could qualify for federal funding through a tax credit program called New Markets Tax Credit (NMTC), which were regulated by the U.S. Treasury through the Community Development Financial Institution (CDFI).

8.    Through the NMTC Program, the U.S. Treasury's CDFI Fund allocates tax credit authority to intermediaries like the Tax Credit company, which are designated as Community Development Entities (CDEs) through a competitive application process. CDEs are financial intermediaries through which private capital flows from an investor to a qualified business located in a low-income community. CDEs like the Tax Credit company use their authority to offer tax credits to investors in exchange for equity in the CDE. Using the capital from these equity investments, CDEs can make loans to and investments in businesses operating in low-income communities on better rates and terms and more flexible features than generally otherwise available in the market. In exchange for investing in CDEs, investors claim a tax credit worth 39 percent of their original CDE equity stake, which is claimed over a seven-year period.

9.    The Tax Credit company applied to be, and was approved as, a CDE for the New Markets Tax Credit program. It then applied at various times to CDFI for allocations of tax credits for approved projects. Once it had an allocation, it solicited real estate projects in the Fresno area and investors (typically financial institution lenders) to help with funding the projects in exchange for the tax credits. From 2010 to 2019, the Tax Credit company was CDE over a dozen local projects, including a movie theater near Fresno State University, multiple health clinics, a downtown Fresno day care center, and the

building expansion of a community college.

10. The life cycle of NMTC financial transactions for the Tax Credit company was generally as follows:

a) A potential borrower agreed with the Tax Credit company to explore participation in the NMTC Program, generally with the submission of a proposed project.

b) A commitment letter from the Tax Credit company, signed by COX, typically required payment of a good faith deposit or advance payment of audit or legal fees to the Tax Credit company, who would then be expected to use the funds to pay expenses associated with assessment of the NMTC project. In some instances, the borrower would get back some or all of the deposited money at the closing or exit of the NMTC transaction.

c) The Tax Credit company would seek out institutional lenders to provide loan funding for part of the project in exchange for the ability to access tax credits over a seven year cycle.

d) Funds from lenders and borrowers were placed in restricted bank accounts maintained by the Tax Credit company, and were audited by accounting firms and consultants for the Tax Credit company and lenders.

e) Borrowers typically put in a portion of their own money and/or other private loan money to fund their project. Expenses to be paid by the borrower included a closing fee to the Tax Credit company, annual maintenance fees to the Tax Credit company for maintaining the bank accounts, and funds to the Tax Credit company to pay auditors and legal fees.

f) COX was the primary point of contact at the Tax Credit company for borrowers and investors. COX generally represented to borrowers that funds payable to the Tax Credit company were for legitimate purposes or services rendered such as good-faith deposits, administrative fees, management fees, audit fees, legal fees, and other NMTC-related expenses.

11. COX, as managing member of the Tax Credit company, received a salary and potential bonus as compensation for his work as managing member. At all relevant times, COX had signatory authority over the Tax Credit company's bank accounts, including the company's operating account, United Security Bank account x1810.

12. The operating agreements between the owners of the Tax Credit company did not

authorize COX as managing member to transfer company money (apart from his compensation) at his sole, limitless discretion and did not permit COX to divert revenue or compensation due to the Tax Credit company to himself. The operating agreements also did not permit the managing member to incur any debt or obligation in excess of $50,000, or enter into an obligation that the Tax Credit company could not terminate on thirty days' notice without the consent of the other owners.

13. On approximately December 17, 2013, in the State and Eastern District of California, COX opened, and was the sole signatory on, bank account x8631 at California Bank & Trust. He deceptively named the account "MJTJ, LLC d/b/a [Tax Credit company]" to refer to the name of the Tax Credit company. This bank account was opened without the knowledge of the other owners and without the knowledge of the Tax Credit company's accountants, tax preparers or auditors.

14. Between 2013 and 2018, COX used the x8631 bank account, without the knowledge and consent of the co-owners, to divert checks made out to the Tax Credit company and wire transfers intended for the Tax Credit company from borrowers, vendors and others, and generally used the diverted money for personal expenses, to fund other COX business ventures, and to pay other COX personal and business debts.

15. In diverting checks, COX would take a check made out to the Tax Credit company and deposit it into his x8631 bank account. For example, on or about December 17, 2013, COX deposited a check from an entity seeking to explore an NMTC project. The $40,000 check was made out to the Tax Credit company, but was deposited into COX's MJTJ, LLC x8631 account. Following the deposit, COX moved a portion of the money to another one of his affiliated business and moved the remainder of the money into one of his personal accounts via a check made out to himself.

16. In diverting wire transfers, COX caused to be sent to borrowers wire instructions that substituted his x8631 bank account for the actual Tax Credit company x1810 operating account. For example, COX caused wire instructions to be sent to a health care company participating in an NMTC project for the payment of a $324,000 closing fee to the Tax Credit company. These wire instructions directed the health care company to send the closing fee to COX's x8631 account instead of the Tax Credit company business account by falsely representing x8631 as an account belonging to the Tax Credit company. On or about January 4, 2016, the $324,000 closing fee was sent via interstate wire

transmission to COX's x8631 account.

17.     For all diverted money in this scheme, the payor did not intend to give or lend any of the money to COX personally for personal expenses or business expenses other than fees and compensation due to the Tax Credit company. Several of the diverted checks deposited into x8631 cleared through servers located outside of the state of California. Several of the diverted wire transfers deposited into x8631 were transmitted via interstate wire transmission.

18.     At all relevant times, COX acted with intent to defraud. As a result of the defendant's conduct, COX caused losses exceeding $1,000,000 from borrowers and the Tax Credit company.

### C.     Use of Wire Transmissions

19.     On or about the dates listed below, in the State and Eastern District of California, for the purpose of executing the aforementioned scheme and artifice to defraud, defendant TERRANCE JOHN COX knowingly transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce the following writings, signs, signals, pictures and sounds:

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

| COUNT | APPROXIMATE DATE OF WIRE | DESCRIPTION | SENDER/PAYOR | RECEIVER/ PAYEE |
|---|---|---|---|---|
| ONE | 8/30/2018 | Wire transmission of monies in the amount of $30,000 from Westamerica Bank, from account number x6150 to California Bank & Trust, account number x8631, in Fresno, California, which passed interstate | Health Care company #1 | MJTJ, LLC |
| TWO | 9/6/2018 | Deposit of check for $75,000 drawn on Rabobank, N.A., account number x8604 into California Bank & Trust, account number x8631, in Fresno, California, which cleared through interstate wire transmission | Health Care company #2 | MJTJ, LLC |
| THREE | 10/9/2018 | Wire transmission of monies in the amount of $120,000 from Westamerica Bank, from account number x6150 to California Bank & Trust, account number x8631, in Fresno, California, which passed interstate | Health Care company #1 | MJTJ, LLC |

All in violation of Title 18, United States Code, Section 1343.

COUNTS FOUR THROUGH NINE: [18 U.S.C. § 1956(a)(1)(B)(i) – Money Laundering]

The Grand Jury further charges:

TERRANCE JOHN COX, aka T.J. Cox,

defendant herein, as follows:

20. The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 18 of this Indictment.

21. On or about the dates listed below, within the State and Eastern District of California and elsewhere, defendant TERRANCE JOHN COX did knowingly conduct and attempt to conduct a financial transaction affecting interstate commerce, to wit, deposited checks and bank account transfers, which involved the proceeds of a specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, knowing that the transaction was designed in whole and in part to

conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, as follows:

| COUNT | APPROXIMATE DATE | AMOUNT | FINANCIAL TRANSACTION |
|---|---|---|---|
| FOUR | 8/31/2018 | $21,000 | Bank counter check for $41,000 from California Bank & Trust x8631 to COX business CMSS Management, with $21,000 deposited into California Bank & Trust, account number x1741. |
| FIVE | 8/31/2018 | $20,000 | Bank counter check for $41,000 from California Bank & Trust x8631 to COX business CMSS Management, with $20,000 deposited into COX personal account California Bank & Trust, account number x8096. |
| SIX | 9/7/2018 | $55,000 | Bank counter check for $55,000 from California Bank & Trust x8631 to COX business CMSS Management deposited into California Bank & Trust, account number x1741 |
| SEVEN | 9/7/2018 | $20,000 | Bank counter check for $20,000 from California Bank & Trust x8631 to COX deposited into COX personal account California Bank & Trust, account number x8096 |
| EIGHT | 10/10/2018 | $50,000 | Bank counter check for $50,000 from California Bank & Trust x8631 to COX deposited into COX personal account California Bank & Trust, account number x8096 |
| NINE | 10/16/2018 | $30,000 | Bank counter check for $30,000 from California Bank & Trust x8631 to COX deposited into COX personal account California Bank & Trust, account number x8096 |

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

COUNTS TEN THROUGH SIXTEEN:  [18 U.S.C. § 1343 – Wire Fraud]

The Grand Jury further charges:

TERRANCE JOHN COX, aka T.J. Cox,

defendant herein, as follows:

22.    The Grand Jury realleges and incorporates by reference the allegations set forth in

paragraphs 1 through 4 of this Indictment.

## III.     FRAUD INVOLVING THE ALMOND PROCESSING COMPANY AND ITS POTENTIAL INVESTORS

### A.     Scheme to Defraud

23.     Beginning on a date unknown to the Grand Jury, but not later than in or about April 2017 and continuing to and including at least December 2020, in the State and Eastern District of California and elsewhere, defendant TERRANCE JOHN COX knowingly devised, intended to devise, participated in, and executed a material scheme and artifice to defraud potential investors in and lenders to the Almond Processing company and the Almond Processing company of money and property, and to obtain money and property from investors in and lenders to the Almond Processing company and the Almond Processing company by means of materially false and fraudulent pretenses, representations, and promises.

### B.     Manner and Means

24.     The scheme to defraud was carried out, in substance, generally in the following manner:

25.     In approximately 2012, COX joined the Almond Processing company as a partial owner, and was brought into the company primarily for the purpose of seeking investor funding to expand operations. The Almond Processing company was started by two other individuals. The company's primary operating bank account was opened at Fresno First Bank, account number x4974, with COX and one other individual as signatories. The company also had an authorized corporate account with multiple company signatories at Citizens Business Bank, account number x5382.

26.     On or about April 24, 2015, COX opened a bank account under the name of the Almond Processing company at Wells Fargo Bank, account number x9696, which was not known to or authorized by his business partners and which was not disclosed to the business's accountants. COX then used the x9696 account, without the knowledge and consent of the co-owners, to divert money from and intended for the Almond Processing company to COX and his other affiliated businesses.

27.     Between April 2017 and February 2018, COX solicited individuals to invest in or loan money to the Almond Processing company. Among other false representations, COX falsely represented that the money was needed for the Almond Processing company's operating expenses,

expansion of the business, or almond processing equipment. COX further falsely represented to certain investors/lenders that they would receive a fixed rate of return as well as a percentage of ownership in the Almond Processing company.

28.     In approximately April 2017, COX solicited L.T. and T.T., former investors in a senior center managed by COX, to lend $100,000 to his Almond Processing company. The $100,000 was given in the form of checks made out to COX and was deposited into COX's personal account, Wells Fargo account number x5244. COX falsely represented to L.T. and T.T. that the loan was only needed for a few months for almond processing equipment. Over four years, COX made a handful of interest payments to L.T. and T.T. and did not return the principal as they requested. More than $40,000 of L.T. and T.T.'s loan was used for COX's personal expenses, including private school tuition, credit card payments, mortgage payments and a $7,000 payment to COX's private political consultant.

29.     In or about June 2017, COX began using the x9696 account to receive potential investor and lender funds. In some instances, no investment/loan funds were ever sent to the Almond Processing company, but were spent on COX's personal and business expenses. In other instances, COX spent all or a portion of investment/loan money on Almond Processing company expenses, but falsely represented to the Almond Processing company that the money belonged to him personally in order to receive credit against prior personal loans he took from the Almond Processing company or to claim a personal loan made to the Almond Processing company that it needed to pay back to COX. Where COX used investor funds for Almond Processing expenses, but claimed it as funds he personally loaned to the Almond Processing company, those investors/lenders were not reflected in the Almond Processing company's financial records as having loaned or invested that money in the company.

30.     At various times, COX also sent money from the Tax Credit company to account x9696 and falsely represented to the Tax Credit company that the money constituted loans from the Tax Credit company to the Almond Processing company. These purported loans were reflected on the Tax Credit company's financial records and reports as outstanding liabilities owed to them by the Almond Processing company. However, these purported loans would be deposited into the x9696 account and then COX would spend the money on personal expenses or on expenses for other COX-affiliated entities other than the Almond Processing company.

31.  In early 2018, COX persuaded additional investors to make loans to and investments in the Almond Processing company. COX would provide information about the operations of the Almond Processing company and promised investors and lenders specific payback terms, a rate of interest and an "equity kicker" of a small percentage of ownership in the Almond Processing company. COX had certain investors/lenders sign false and fraudulent promissory notes and security agreements purportedly securing their loan/investment. COX would also receive funds from investors and lenders, such as individuals J.S. and D.G., place the funds into the x9696 account and spend the money on personal expenses and/or COX's other businesses.

32.  COX obtained funds from investor/lenders via checks made out to the Almond Processing company or Automated Clearinghouse (ACH) transfer. The ACH transfer and several of the checks received by COX and deposited into the x9696 account cleared via interstate wire transmission.

33.  At all relevant times, COX acted with intent to defraud. As a result of the defendant's conduct, COX caused losses exceeding $750,000 from lenders/investors and the Almond Processing company.

**C.    Use of Wire Transmissions**

34.  On or about the dates listed below, in the State and Eastern District of California, for the purpose of executing the aforementioned scheme and artifice to defraud, defendant TERRANCE JOHN COX knowingly transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce the following writings, signs, signals, pictures and sounds:

///

///

///

///

///

///

///

///

///

| COUNT | APPROXIMATE DATE OF WIRE | DESCRIPTION | PAYOR | PAYEE |
|---|---|---|---|---|
| TEN | 9/28/2017 | Deposit of check for $50,000 drawn on Central Valley Community Bank, account number x0964, into Wells Fargo Bank, account number x9696, in Fresno, California, which cleared through interstate wire transmission | W.L. | COX via x9696 account under the name of the Almond Processing company |
| ELEVEN | 9/28/2017 | Deposit of check for $50,000 drawn on Central Valley Community Bank, account number x5124, into Wells Fargo Bank, account number x9696, in Fresno, California, which cleared through interstate wire transmission | C.R. | COX via x9696 account under the name of the Almond Processing company |
| TWELVE | 1/24/2018 | Deposit of check for $100,000 drawn on Fresno County Federal Credit Union, account number x0009, into Wells Fargo Bank, account number x9696, in Fresno, California, which cleared through interstate wire transmission | R.H. and L.H. | COX via x9696 account under the name of the Almond Processing company |
| THIRTEEN | 2/13/2018 | Deposit of check for $200,000 drawn on J.P. Morgan Chase Bank, account number x3210, into Wells Fargo Bank, account number x9696, in Fresno, California, which cleared through interstate wire transmission | M.N. | COX via x9696 account under the name of the Almond Processing company |
| FOURTEEN | 2/21/2018 | Automated Clearinghouse (ACH) electronic transfer of monies in the amount of $100,000 from Bank of America, trace number x6291, to Wells Fargo Bank, account number x9696, in Fresno, California, which was processed via interstate wire transmission | E.M. | COX via x9696 account under the name of the Almond Processing company |

| | | | | |
|---|---|---|---|---|
| FIFTEEN | 2/26/2018 | Deposit of check for $150,000 drawn on Union Bank, account number x5791, into Wells Fargo Bank, account number x9696, in Fresno, California, which cleared through interstate wire transmission | J.S. | COX via x9696 account under the name of the Almond Processing company |
| SIXTEEN | 2/26/2018 | Deposit of check for $100,000 drawn on Bank of America, account number x2747, into Wells Fargo Bank, account number x9696, in Fresno, California, which cleared through interstate wire transmission | D.G. | COX via x9696 account under the name of the Almond Processing company |

All in violation of Title 18, United States Code, Section 1343.

<u>COUNTS SEVENTEEN THROUGH TWENTY-ONE</u>:  [18 U.S.C. § 1956(a)(1)(B)(i) – Money Laundering]

The Grand Jury further charges:

TERRANCE JOHN COX, aka T.J. Cox,

defendant herein, as follows:

35.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 4 and 22 through 33 of this Indictment.

36.     On or about the dates listed below, within the State and Eastern District of California and elsewhere, defendant TERRANCE JOHN COX did knowingly conduct and attempt to conduct a financial transaction affecting interstate commerce, to wit, issuing checks and bank account transfers, which involved the proceeds of a specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, as follows:

///

///

INDICTMENT

| COUNT | APPROXIMATE DATE | AMOUNT | FINANCIAL TRANSACTION |
|---|---|---|---|
| SEVENTEEN | 2/21/2018 | $70,000 | Check for $70,000 from COX, Wells Fargo Bank, account number x5244, to Investment Company #1, with written memo line "Loan Repay" |
| EIGHTEEN | 2/28/2018 | $14,000 | Online bank account transfer of $14,000 from Wells Fargo Bank, account number x9696, to the Sports non-profit, Wells Fargo Bank, account number x6877, referenced as "Tj Loan Repay." |
| NINETEEN | 2/28/2018 | $15,000 | Online bank account transfer of $15,000 from Wells Fargo Bank, account number x9696, to COX personal account, California Bank & Trust, account number x8096 |
| TWENTY | 3/7/2018 | $20,000 | Online bank account transfer of $20,000 from Wells Fargo Bank, account number x9696, to COX personal account, Wells Fargo Bank, account number x5244 |
| TWENTY-ONE | 3/12/2018 | $15,000 | Online bank account transfer of $15,000 from Wells Fargo Bank, account number x9696, to the Sports non-profit, Wells Fargo Bank, account number x8477, referenced as "Loan From Tj." |

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

COUNTS TWENTY-TWO THROUGH TWENTY-SIX:  [18 U.S.C. § 1343 – Wire Fraud Affecting a Financial Institution]

The Grand Jury further charges:

TERRANCE JOHN COX, aka T.J. Cox,

defendant herein, as follows:

37.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 4 of this Indictment.

## IV.     FRAUD INVOLVING A LOAN TO THE SPORTS NON-PROFIT

### A.     Scheme to Defraud

38.     Beginning on a date unknown to the Grand Jury, but not later than in or about August 2016 and continuing to and including at least August 2017, in the State and Eastern District of California and elsewhere, defendant TERRANCE JOHN COX knowingly devised, intended to devise, participated

in, and executed a material scheme and artifice to defraud a lender to the Sports non-profit, Clearinghouse CDFI ("Clearinghouse"), a financial institution, and to obtain money and property from Clearinghouse to the Sports non-profit by means of materially false and fraudulent pretenses, representations, and promises.

### B. Manner and Means

39. The scheme to defraud was carried out, in substance, generally in the following manner:

40. In approximately 2013, COX and a business partner formed the Sports non-profit which began operating a small local ice rink for ice skating and hockey in Fresno.

41. In approximately December 2015, COX and a business partner, through the Sports non-profit, arranged for a lease of land owned by the City of Fresno at the corner of Cedar and Dakota Avenues in East Central Fresno, which was commonly known as Granite Park. The twenty-five year lease with the City of Fresno required that the Sports non-profit utilize Granite Park for sports and recreational use, and pay rent to the City of Fresno of approximately $62,500 per year with credit for capital improvements. The City of Fresno further promised the Sports non-profit $150,000 a year to operate Granite Park. The lease also obligated the Sports non-profit to diligently improve the land within Granite Park for recreational use.

42. Following the execution of the lease with the City of Fresno, in 2016, COX and his business partner sought a construction loan from lender Clearinghouse. Clearinghouse was a lender headquartered in Lake Forest, California that specialized in making loans to develop properties in low-income and disadvantaged communities throughout the United States, including California, Nevada, Arizona, New Mexico and Texas. Clearinghouse is, and was at all relevant times, a financial institution as defined in Title 18, United States Code, Section 20. Clearinghouse had previously participated in NMTC projects with COX and the Tax Credit company, and was familiar with COX and the Tax Credit company's business activities at the time the Sports non-profit began seeking a construction loan.

43. In 2016, the Sports non-profit, through COX and his business partner, applied to Clearinghouse for a $1.5 million construction loan to develop Granite Park. During the application process, COX and his business partner first tried to qualify for the loan by submitting their personal financial information, the financial records of the ice skating rink, projections of predicted revenue from

1  Granite Park, and proof of the City of Fresno's commitment of $150,000 a year to the Sports non-profit
2  for operation of Granite Park.

3      44.     However, Clearinghouse further required a guaranty from a financially viable source to
4  support the loan.  COX submitted the Tax Credit company to Clearinghouse as the commercial
5  guarantor on the loan, including submission of the Tax Credit company's financial information.
6  Because COX was not the sole owner of the Tax Credit company, Clearinghouse required proof that all
7  the owners of the Tax Credit company agreed to guarantee the loan to the Sports non-profit.  The Tax
8  Credit company's operating agreement only permitted COX, as managing member, to incur debts on
9  behalf of the company of less than $50,000.  As the construction loan was for approximately $1.5
10  million, the operating agreement, and Clearinghouse, required the owners to agree to the debt.  Proof of
11  the owners' agreement to guarantee the loan was a material term of Clearinghouse's approval of the
12  loan.  As proof of consent to the guaranty, COX submitted and caused to be submitted to Clearinghouse
13  a false and fabricated board resolution purporting to be a record of the Tax Credit company that falsely
14  indicated a board meeting took place and falsely represented that all three Tax Credit company owners
15  agreed to guarantee the $1.5 million loan to the Sports non-profit.  In fact, no meeting took place where
16  the Tax Credit company owners agreed to back the Sports non-profit's loan, and the other owners did
17  not agree to guarantee the loan.  Nevertheless, COX signed a commercial guaranty for the loan
18  purporting to act on behalf of the Tax Credit company.

19      45.     Following approval of the construction loan, Clearinghouse distributed loan funds to the
20  Sports non-profit.  As the Sports non-profit made approved expenditures for the improvement of Granite
21  Park, it would submit requests to Clearinghouse for draws of construction loan funds.  The disbursement
22  of the construction loan occurred via five wire transfers from Clearinghouse between February and
23  August 2017.  The Sports non-profit would send in funding requests with details of construction
24  expenditures and invoices and once approved by Clearinghouse, loan funds would be wired from
25  Clearinghouse to the Sports non-profit's Wells Fargo Bank account number x8477, opened in Fresno,
26  California.  These wire transfers were made via interstate wire transmission.

27      46.     In September 2019, the Sports non-profit defaulted on the construction loan and
28  Clearinghouse made efforts to enforce the terms of the loan agreement and fraudulently obtained

commercial guaranty. After COX's departure from the Tax Credit company, the Tax Credit company purchased the Sports non-profit's debt due to Clearinghouse for the remaining loan balance.

47. At all relevant times, COX acted with intent to defraud. Due to the defendant's conduct, COX caused a loss exceeding $1.28 million in fraudulently obtained loan funds.

### C. Use of Wire Transmissions

48. On or about the dates listed below, in the State and Eastern District of California, for the purpose of executing the aforementioned scheme and artifice to defraud, defendant TERRANCE JOHN COX knowingly transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce the following writings, signs, signals, pictures and sounds:

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

| COUNT | APPROXIMATE DATE OF WIRE | DESCRIPTION | SENDER | RECEIVER |
|---|---|---|---|---|
| TWENTY-TWO | 2/9/2017 | Wire transmission of monies in the amount of $616,279.26 from Clearinghouse, from Wells Fargo Bank, account number x3929 to Wells Fargo Bank, account number x8477, in Fresno, California, which passed interstate | Clearinghouse | Sports non-profit, into Wells Fargo Bank, account number x8477 |
| TWENTY-THREE | 4/7/2017 | Wire transmission of monies in the amount of $569,692.05 from Clearinghouse, from Wells Fargo Bank, account number x3929 to Wells Fargo Bank, account number x8477, in Fresno, California, which passed interstate | Clearinghouse | Sports non-profit, into Wells Fargo Bank, account number x8477 |
| TWENTY-FOUR | 5/26/2017 | Wire transmission of monies in the amount of $120,912.39 from Clearinghouse, from Wells Fargo Bank, account number x3929 to Wells Fargo Bank, account number x8477, in Fresno, California, which passed interstate | Clearinghouse | Sports non-profit, into Wells Fargo Bank, account number x8477 |
| TWENTY-FIVE | 7/26/2017 | Wire transmission of monies in the amount of $132,674.93 from Clearinghouse, from Wells Fargo Bank, account number x3929 to Wells Fargo Bank, account number x8477, in Fresno, California, which passed interstate | Clearinghouse | Sports non-profit, into Wells Fargo Bank, account number x8477 |
| TWENTY-SIX | 8/1/2017 | Wire transmission of monies in the amount of $39,064.33 from Clearinghouse, from Wells Fargo Bank, account number x3929 to Wells Fargo Bank, account number x8477, in Fresno, California, which passed interstate | Clearinghouse | Sports non-profit, into Wells Fargo Bank, account number x8477 |

All in violation of Title 18, United States Code, Section 1343.

///

///

COUNT TWENTY-SEVEN:  [18 U.S.C. § 1344 – Financial Institution Fraud]

The Grand Jury further charges:

TERRANCE JOHN COX, aka T.J. Cox,

defendant herein, as follows:

49.     The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 4 of this Indictment.

50.     At all relevant times, Stearns Lending, LLC (Stearns) was a mortgage lending business headquartered in Santa Ana, California and later Lewisville, Texas.  Stearns originated and underwrote mortgage loans in numerous states, including California.  Stearns was a financial institution as defined by Title 18, United States Code, Section 20.

## V.     FRAUD INVOLVING MORTGAGE LOAN FOR FRESNO HOME

### A.     Scheme to Defraud

51.     Beginning on a date unknown to the Grand Jury, but not later than in and about August 2017, and continuing thereafter to on or about January 2018, within the State and Eastern District of California and elsewhere, defendant TERRANCE JOHN COX, knowingly devised and intended to devise a material scheme and artifice to defraud Stearns Lending, LLC, a financial institution, of money and property, and caused money and property to be obtained from Stearns Lending, LLC, by means of materially false and fraudulent pretenses, representations, and promises.

### B.     Manner and Means

52.     One of COX's long-time business partners bought a house on 5205 N. Via Amore in Northwest Fresno and invested in extensive improvements to the home.  By mid-2017, the business partner sought a buyer for the home, but wanted the full amount of the improvements in addition to the value of the land.

53.     COX offered to buy the house from his business partner for the purpose of renting it to another one of his business partners.  However, COX needed a mortgage loan to be able to purchase the home from his business partner.

54.     In or about October 2017, COX, through his mortgage broker, applied for a mortgage loan with Stearns Lending.  COX knowingly, and with the intent to defraud, caused a loan application

package and supplemental documentation that contained material misstatements to be submitted to Stearns Lending for the purpose of acquiring loan proceeds for the purchase of the home on Via Amore. COX qualified for a $315,000 loan toward a falsely represented sales price of $350,000.

55. The material misstatements included false statements concerning several aspects of COX's loan application. For example, COX falsely represented to Stearns Lending that the Via Amore house was going to be his primary residence.

56. COX also submitted and caused to be submitted fabricated monthly bank statements for two different bank accounts to Stearns Lending to confirm he had seasoned personal funds available to close the home purchase. Among other false representations, the fabricated bank statements were altered to show an additional $50,000 in each account.

57. Stearns required that COX account for his other preexisting mortgage/property debt, and specifically debt related to his residence on Van Ness Avenue. COX falsely represented to the lender that he was going to rent out the Van Ness Avenue home and sent, and caused to be sent to, the lender a fabricated lease agreement between himself and an associate of the Sports non-profit's ice skating rink for the house on Van Ness Avenue. The lease agreement had a forged signature for the Sports non-profit associate.

58. Because COX's business partner wanted to recoup expenses for improving the Via Amore home in the sale, COX agreed to pay an additional $233,000 to his business partner for the home purchase, which additional indebtedness was later memorialized in a promissory note drafted and signed by COX obligating him to pay this second mortgage. The $233,000 debt was unrecorded and not disclosed to Stearns Lending. This second mortgage, if disclosed, would have resulted in the total property debt exceeding 100 percent of the appraised value of the home. This debt in excess of the appraised value would have been material to Stearns Lending's decision to approve the loan.

59. Stearns required COX to have approximately $43,000 in seasoned funds to close the transaction. COX did not have this amount of money available from personal funds. COX instead used an annual maintenance fee owed by an NMTC borrower to the Tax Credit company. In December 2017, COX transferred $46,600 from the NMTC borrower's sub account into the Tax Credit company's operating account. COX then wrote a bank counter check at United Security Bank for $43,008 to obtain

a cashier's check for closing funds for the Via Amore purchase. The memo line of the bank counter check states "Loan to [Almond Processing company]" and was signed by COX. The amount was also recorded in the Tax Credit company's financial records as a loan to the Almond Processing company. The funds were never a loan to the Almond Processing company, never went into an Almond Processing company bank account, and were never paid back by the Almond Processing company. The cashier's check for $43,000 was deposited into the escrow account for the Via Amore purchase to close the transaction.

60. At all relevant times, COX acted with intent to defraud.

61. On or about the date listed below, within the State and Eastern District of California, for the purpose of executing and attempting to execute the aforementioned material scheme and artifice to defraud, TERRANCE JOHN COX caused the commission of the following acts:

| COUNT | APPROXIMATE DATE | DESCRIPTION |
| --- | --- | --- |
| TWENTY-SEVEN | 1/11/2018 | Loan (#xxxxxx9685) from Stearns Lending, LLC of $315,000 for the purchase of the property at 5205 N. Via Amore, Fresno, California 93711. |

All in violation of Title 18, United States Code, Section 1344.

COUNT TWENTY-EIGHT: [52 U.S.C. §§ 30122 and 30109 –Making Conduit Contributions]

The Grand Jury further charges:

TERRANCE JOHN COX, aka T.J. Cox,

defendant herein, as follows:

62. The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 4 of this Indictment.

63. COX was a candidate for the United States House of Representatives in the 2018 election, first seeking to represent California's 10th Congressional District and later seeking to represent California's 21st Congressional District. COX's campaign entity, TJ Cox for Congress, was registered with the Federal Election Commission and subject to specified contribution limits on the allowable contributions by individuals in the 2018 election cycle.

64. The Federal Election Campaign Act of 1971, as amended, Title 52, United States Code,

Sections 30101, *et seq.* ("Election Act"), limited financial influence in the election of candidates for federal office, including the United States House of Representatives, and provided for public disclosure of the financing of federal election campaigns, as follows:

a)      The Election Act limited the amount and source of money that may be contributed to a federal candidate or that candidate's authorized campaign committee and political committees established and maintained by a national party.

b)      The Election Act expressly states that contributions made through an intermediary are treated as contributions from the original payor.

c)      In 2017 and 2018, the Election Act limited both primary and general election campaign contributions to $2,700, for a total of $5,400 from any individual to any one candidate.

65.      To promote transparency and prevent individuals from circumventing these regulations, the Election Act prohibited a person from making a political contribution in the name of another person, including giving funds to a straw donor or conduit for the purpose of having the conduit pass the funds on to a federal candidate as his or her own contribution.

66.      The Federal Election Commission ("FEC") was an agency and department of the United States with jurisdiction to enforce the limits and prohibitions of the Election Act, and to compile and publicly report accurate information about the source and amounts of contributions. The Election Act required candidates to file campaign finance reports accurately disclosing activity related to contributions, expenditures, debts, and loans of the candidate.

67.      Aware of the strict limits on individual federal campaign contributions and importance of showing a strong individual donor base, COX knowingly and willfully devised a scheme and plan whereby he used family members and business associates as prohibited conduits through which to funnel money in his personal possession to his campaign under the guise of lawful campaign contributions.

68.      It was part of the scheme and plan to demonstrate individual campaign donations as preferred over the candidate's personal loans or donations to his campaign in calendar year 2017. COX was aware of this preference for individual campaign donations. The purpose of emphasizing individual donations was to keep pace with competitors that received high numbers of private donations and to

show viability of the candidacy through individual donations. The numbers of private donations received by TJ Cox for Congress in the third and fourth quarters of 2017 assisted COX in seeking election, and receiving political party support, in the 21st Congressional District of California.

69. It was a part of the scheme and plan to knowingly conceal from the FEC and the public the true source and amount of the campaign contributions. It was a part of the scheme and plan to use conduits to knowingly deceive the FEC into believing that COX lawfully raised significant sums of money for his campaign from private donations when, in truth and in fact, he had not.

70. In or about September 2017, COX gave money in his personal possession to adult members of his family, with the intent and purpose that this money would be used to make the maximum allowable contribution to his campaign under the name of the family member knowing that money in his personal possession was used to advance funds and reimburse these individuals. The funding of the contributions was made from a September 21, 2017, bank account withdrawal of $20,000 from COX's x9696 off-the-books bank account in the name of the Almond Processing company and deposit into a family member's bank account. On September 25, 2017, this money was used to fund three maximum campaign contributions in the names of three different COX family members of $5,400 in cash attributed to each family member.

71. In or about December 2017, COX gave money in his personal possession to Business Associate #1 with the intent and purpose that this money would be used to make contributions to his campaign under the names of Business Associate #1 and Business Associate #2. In a check dated November 28, 2017, COX paid Business Associate #1 $8,500. Business Associate #1 wrote a check to TJ Cox for Congress dated December 28, 2017 for a maximum campaign contribution of $5,400. At the time Business Associate #1 deposited the check from COX, they did not have enough money in their bank account to fund a $5,400 contribution. Business Associate #1 also wrote a check dated December 28, 2017 to Business Associate #2 for $2,800. In a check dated December 29, 2017, Business Associate #2 wrote a check to TJ Cox for Congress for $2,700.

72. On or about December 28, 2017, COX withdrew $11,000 from the Sports non-profit's Wells Fargo bank account x6877, which COX caused to be deposited into COX's family member's bank account. The COX family member wrote a check to TJ Cox for Congress for $5,400 dated December

30, 2017. Next to the COX family member's name on the payor section of the check, the name of Individual #1 was hand written. Individual #1 was disclosed by TJ Cox for Congress as having given a maximum campaign contribution for the 2018 election cycle. Individual #1 was unaware that any campaign contribution had been given under their name and did not agree to make such a contribution.

73.     In or about September 2017 and December 2017, and in furtherance of his scheme and plan, COX caused TJ Cox for Congress to file reports with the FEC falsely stating that the conduits had made the contributions, when in truth and in fact, and as COX well knew, each contribution was funded by COX using money in his personal possession.

74.     From in or about September 2017 through in or about December 2017, in the State and Eastern District of California, and elsewhere, the defendant, TERRANCE JOHN COX, knowingly and willfully made contributions in the name of another person, which aggregated $25,000 and more in calendar year 2017.

All in violation of Title 52, United States Code, Sections 30122 and 30109, and Title 18, United States Code, Section 2.

FORFEITURE ALLEGATION:     [18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), 18 U.S.C. §§ 982(a)(1), and 982(a)(2) - Criminal Forfeiture]

1.     Upon conviction of one or more of the offenses alleged in Counts One through Three, Counts Ten through Sixteen, and Counts Twenty-Two through Twenty-Six of this Indictment, defendant TERRANCE JOHN COX shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, which constitutes or is derived from proceeds traceable to such violations, including, but not limited to:

a.     A sum of money equal to the amount of proceeds traceable to such offenses, for which defendant is convicted.

2.     Upon conviction of the offenses alleged in Counts Four through Nine, and Counts Seventeen through Twenty-One of this Indictment, defendant TERRANCE JOHN COX shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), all property, real or personal, involved in such offenses, and any property traceable to such property, including but not limited to the following:

1          a.      A sum of money equal to the amount of money involved in the offenses, for

2                   which defendant is convicted.

3     3.     Upon conviction of the offense alleged in Count Twenty-Seven of this Indictment,

4  defendant TERRANCE JOHN COX shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2),

5  any property constituting or derived from proceeds obtained directly or indirectly, as a result of said

6  violation, including but not limited to the following:

7          a.      A sum of money equal to the amount of money involved in the offenses, for

8                   which defendant is convicted.

9     4.     If any property subject to forfeiture as a result of the offenses alleged in Counts One

10  through Twenty-Seven of this Indictment, for which defendant is convicted:

11          a.      cannot be located upon the exercise of due diligence;

12          b.      has been transferred or sold to, or deposited with, a

13                   third party;

14          c.      has been placed beyond the jurisdiction of the court;

15          d.      has been substantially diminished in value; or

16          e.      has been commingled with other property which cannot be divided without

17                   difficulty;

18  it is the intent of the United States, pursuant to 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)(1),

19  incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant, up to the

20  value of the property subject to forfeiture.

21                              A TRUE BILL.

22                              **/s/ Signature on file w/AUSA**

23

24                              _____

25                              FOREPERSON

_____

PHILLIP A. TALBERT

26  United States Attorney

27

28